**Complaint Concerning The Honorable Robert Crane WINTON, Jr., Judge of District Court, Hennepin County, State of Minnesota.**

No. C8–83–150.

Supreme Court of Minnesota.

May 25, 1984.

---

Kelton Gage and Stephen P. Rolfsrud, Mankato, for petitioner.

Peter Thompson, Minneapolis, John McNulty, St. Paul, Joseph S. Friedberg, Minneapolis, for respondent.

Abby Rubenfeld, Christopher T. Lamal, New York City, for Lambda Legal Defense & Education Fund Inc.

Amy M. Silberberg, Minneapolis, for MN Civil Liberties Union.

Leonard Graff, San Francisco, Cal., for National Gay Rights Advocates.

## OPINION

PER CURIAM.

This is a judicial discipline matter that comes before us on the November 2, 1983, recommendation of the Board on Judicial Standards for removal of the Honorable Robert Crane Winton, Jr., Judge of District Court, Hennepin County, for willful misconduct prejudicial to the administration of justice.

### Procedural History

The acts of misconduct of respondent, Judge Robert Crane Winton, Jr., came to public attention in February 1982 in the course of a series of televised investigatory reports concerning sexual abuse of children. The reports included allegations that respondent had engaged in prostitution with young men. These allegations led to an investigation and subsequent indictment by a Hennepin County Grand Jury on May 7, 1982, for felony and misdemeanor prostitution. *See* Minn.Stat. § 609.324, subds. 1(2), 3(2) (1982). The Board on Judicial Standards (Board), which had independently initiated its own investigation, notified respondent that it would delay its proceed-

ings pending disposition of the criminal charges. On June 21, 1982, the felony charges were dismissed as part of a plea negotiation pursuant to which respondent pled guilty to two counts of misdemeanor prostitution.

■ The Board resumed its investigation and, upon a finding of sufficient cause, filed formal charges against respondent on September 20, 1982. Upon the Board's request, pursuant to Rule 9(a)(2), Rules of Board on Judicial Standards, we appointed a panel of referees (panel) on March 1, 1983.[1] The panel held a formal hearing during the period May 10 to May 27, 1983. The court reporter delivered the full transcript of 1,247 pages to the panel on July 20, 1983. The panel returned its findings of fact, conclusions, and recommendation to the Board on September 30, 1983. The Board thereafter considered the record and the panel's report and on November 2, 1983, with one exception, adopted the panel's findings, conclusions, and recommendation; in addition, the Board recommended assessment of costs and expenses against respondent.[2]

On November 10, 1983, following receipt of the record and recommendation from the Board, we issued an order setting a briefing schedule for the parties and setting oral argument for January 13, 1984. On November 30, 1983, the Minnesota Civil Liberties Union filed a motion for leave to appear as an amicus curiae, and, thereafter, the National Gay Rights Advocates and the Lambda Legal Defense & Education Fund filed similar motions, all of which were granted. The Board filed its brief on December 2, 1983, as scheduled, but, at the request of counsel for respondent, we granted an extension of time to file respondent's brief and reset oral argument for the next available date, April 3, 1984. The remaining briefs were filed in a timely manner, and we heard oral argument on April 3, 1984.

## Standard of Conduct

The Code of Judicial Conduct focuses on conduct prejudicial to the administration of justice, which includes but is not limited to criminal conduct. The general focus on *conduct* is mandated by the Minnesota Constitution,[3] the statute authorized by the constitution,[4] and the Rules of the Board on Judicial Standards adopted pursuant to statute.[5]

---

1. This court's role at this stage of a disciplinary proceeding is solely to appoint a referee or panel of referees who will conduct a hearing and return a full transcript of its proceedings together with its findings to the Board, not to this court. "Referees are intended to permit an efficient and economical gathering of evidence for review." *In re Gillard,* 271 N.W.2d 785, 813 (Minn.1978).

 We appointed a panel of respondent's judicial peers: District Court Judge Nicholas S. Chanak (Retired), District Court Judge William J. Nierengarten, and County Court Judge Charles C. Johnson. Because of the long-time judicial service of respondent, it required considerable time to find judges with minimal prior personal or professional relationships with respondent who were available and willing to serve. Judge Chanak is chambered in Hibbing, Judge Nierengarten in Austin, and Judge Johnson in Mankato. The panel conducted its hearing in a St. Paul courtroom, requiring panel members to adjust their regular judicial schedules before meeting.

2. The Board consists of three judges, two lawyers, and four non-lawyer citizens. The Board's recommendation for removal was adopted with

two judges abstaining, one lawyer voting "No," and one non-lawyer dissenting from so much of the recommendation for removal as rested on the finding that respondent committed sodomy but agreeing that the recommendation was supported by other findings and conclusions.

3. Minn. Const. art. 6, § 9, provides: "The legislature may * * * provide for the * * * removal or other discipline of any judge who is * * * guilty of conduct prejudicial to the administration of justice."

4. Minn.Stat. § 490.16, subd. 3 (1982), provides: "On recommendation of the board on judicial standards, the supreme court may * * * censure or remove a judge for * * * conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

5. Rule 4(a), Rules of Board on Judicial Standards, establishes the following grounds for judicial discipline:
 (1) Conviction of a felony;
 (2) Willful misconduct in office;
 (3) *Willful misconduct which, although not related to judicial duties, brings the judicial office into disrepute;*

The heart of the Code of Judicial Conduct is expressed in Canon 1, which recognizes that "[a]n independent and honorable judiciary is indispensable to justice in our society" and provides that a judge should "observe high standards of conduct so that the integrity and independence of the judiciary may be preserved."

Canon 2(a) requires a judge to "respect and comply with the law" and to act "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

 A judge has a position of power and prestige in a democratic society espousing justice for all persons under law. The role of a judge in the administration of justice requires adherence to the highest standard of personal and official conduct. Of those to whom much is committed, much is demanded. A judge, therefore, has the responsibility of conforming to a higher standard of conduct than is expected of lawyers or other persons in society. Willful violations of law or other misconduct by a judge, whether or not directly related to judicial duties, brings the judicial office into disrepute and thereby prejudices the administration of justice. A judge's conduct in his or her personal life adversely affects the administration of justice when it diminishes public respect for the judiciary. Our legal system can function only so long as the public, having confidence in the integrity of its judges, accepts and abides by judicial decisions. The essential attributes of a judge are not only intellectual competence but adherence to ethical standards of conduct.

### Respondent's Acts of Misconduct

Our responsibility, upon independent review of the record and the findings submitted by the Board, is to determine the appropriate judicial discipline by measuring respondent's conduct against these ethical standards. It is a record of misconduct revealing an extensive course of soliciting and engaging in prostitution with 15 to 20 young male prostitutes during a period of 7 or 8 years, all in violation of Minn.Stat. § 609.324 (1982). The sexual misconduct in most, not all, instances was sodomous and violative of Minn.Stat. § 609.293 (1982); however, since we are told by counsel for respondent that "sodomy is a regular course of activity between a customer and a prostitute whether it be homosexual or heterosexual," we direct our attention solely to the offenses of prostitution.

The facts regarding prostitution as developed in the record and the panel's findings are for the most part undisputed, except for details as to frequency of some of the sexual contacts and a substituted finding made by the Board. All of the occurrences originated in the Loring Park area of Minneapolis, within a few blocks of respondent's home, in an area known by respondent to be frequented by male prostitutes looking for customers and to which respondent went, in his words, "looking to pick a boy up." (Respondent testified that in each case he asked the prostitute whether he was under 18 years of age because respondent "didn't want to do it with anyone other than a consenting adult.") Respondent admitted that he paid money in exchange for sexual "services." He also admitted that several of the prostitutes were aware that he was a judge.

The first prostitute engaged by respondent was Mark Haley. Respondent picked Haley up 7 to 8 years ago in the Loring Park area and brought Haley to his home. Haley was 18 or 19 years old. Respondent and Haley had no further sexual contact, although respondent testified that he saw

---

(4) *Conduct prejudicial to the administration of justice or conduct unbecoming a judicial office, whether conduct in office or outside of judicial duties, that brings the judicial office into disrepute;*
(5) Any conduct that constitutes a violation of the code of judicial conduct or professional responsibility.

(emphasis added).
Rule 7(a) and 7(b), dealing with interim sanctions upon a judge charged with criminal conduct, make clear that the ultimate discipline is in no way controlled by an acquittal, conviction, or other disposition of the criminal charges.

Haley again "five, six or seven times after that"—two or three of those times at respondent's judicial chambers. Respondent testified that at one time Haley told respondent that he was in trouble with the Minneapolis police because he missed a court date. Respondent told Haley he could not advise him and told Haley to report to his probation officer.

John James Scharver, a 17-year-old prostitute, who was the subject of one of the two misdemeanor convictions, engaged in sexual contact with respondent in the late summer of 1980. Scharver testified by deposition [6] that he told respondent he was 17 years of age, but the panel and the Board credited respondent's testimony that he did not know that Scharver was under 18 years of age at the time. Scharver testified that respondent gave him a piece of paper marked "From the desk of Crane Winton," bearing respondent's telephone number. They did not have sexual contact again.

Timothy Flaherty, another prostitute, age 23 or 24, accompanied Scharver to respondent's home in April 1981, Scharver's purpose being to prove to his companion that he knew a judge. Although there was no sexual contact during the first visit, respondent later met Flaherty at Loring Park and brought him to his home for sexual relations.

Richard Pat Penland, the subject of the second misdemeanor conviction, had sexual relations with respondent in the fall of 1979 or 1980, when Penland was 21 or 22 years old. Penland testified by deposition that after their first encounter respondent told Penland that he would like to see him again and gave Penland his telephone number. The number of times that respondent had sexual relations with Penland is in dispute. It is clear from respondent's testimony that they met at least three more times and had sexual relations on at least one of those occasions. At their final meeting, respondent gave Penland his personal check for $65; Penland cashed the check at a Hennepin Avenue bar.

Rickie Lee Howard, a 22 year old, was picked up by respondent in Loring Park on May 27, 1980, and was taken to respondent's home, where they engaged in sexual relations. Respondent issued Howard his personal check for $20.

The panel heard evidence with respect to respondent's alleged sexual contacts with five other persons identified as prostitutes—Thomas Conyers, Scott Finch, Jeffrey Michael Pugh, Lloyd Charles Howard, and Daryl Lee Hanson—but rejected the evidence as not clear and convincing.[7] The Board adopted the panel's findings, except as to Lloyd Charles Howard and Daryl Lee Hanson.

The Board found that respondent engaged in sexual contact with Lloyd Charles Howard, age 16, and Daryl Lee Hanson, who was over 18 years of age. We take note of this controverted fact issue but state that our judgment of discipline is not affected by whether this finding of fact is sustainable. Respondent testified that he did not recall either name. Hanson did not testify, but Howard testified that he, together with Hanson, had sexual relations with respondent in the spring or summer of 1981. Respondent denies that he ever had sexual relations with more than one person at the same time. The panel presumably rejected Howard's testimony because of Howard's admission that he had periods of "blackout," due to emotional problems and heavy drinking, that made it difficult for him to remember many things. He had told investigators that his memory about the evening in question was blank for periods before arriving at and after leaving

---

6. The testimony of several of the witnesses was in the form of depositions received into evidence by stipulation of the parties. The deposition testimony was adduced by direct examination, subject to full cross-examination.

7. Jeffrey Michael Pugh and Daryl Lee Hanson refused to testify, successfully asserting their fifth amendment rights against self-incrimination. The questions put to Hanson included, among others, whether he knew Lloyd Charles Howard, whether he knew respondent, and whether he would identify a statement he made to the Executive Secretary of the Board.

respondent's home and part of the period while he was at the home. However, there is evidence corroborative of Howard's testimony. He recalled having been served drinks by respondent and was "possibly fairly drunk," so drunk that he became nauseous and went to respondent's bathroom. When shown pictures of the interior of respondent's home, Howard stated that "to the best of my ability, but it is a little fuzzy, that is the liquor cabinet of the judge." He was shown a picture of respondent's automobile and a picture of respondent himself. He identified the automobile as that in which he was picked up in Loring Park. He identified respondent, whom he had known previously only by first name, as the man who picked him up. Howard stated that there was "no doubt in my mind that [respondent] was the man I was with that night."

Were these criminal proceedings, this evidence might well fail to constitute proof beyond a reasonable doubt. Were these civil proceedings, the evidence could well preponderate in favor of the Board's finding. This proceeding is neither, but is *sui generis* and, by Rule 9(c)(2), Rules of Board on Judicial Standards, requires evidence that is "clear and convincing." "No mechanistic corroboration requirement is necessary," *In re McDonough*, 296 N.W.2d 648, 692 (Minn.1979), for "uncorroborated evidence may be clear and convincing if the trier of fact can impose discipline with clarity and conviction of its factual justification." *Id.*

This evidence may be viewed in a total context of numerous unquestioned acts of like kind and is not an isolated act. This evidence, as in several other cases, was received in the form of depositions so that the opportunity for assessing credibility was as open to the Board and this court as it was to the panel. Howard's testimony, notwithstanding obvious impairment of memory, was reinforced by memory-refreshing associational facts: critical photo

identification; closeness to the time that he and his friend, Daryl Hanson, ceased "working together"; his being served drinks to the point of illness at the home of the man he positively identified as respondent. Howard's testimony is not countervailed by respondent's own impaired credibility.[8]

Notwithstanding his subsequent admissions as to all other acts of prostitution found by the panel and the Board, respondent, in a deposition before the Board, falsely denied under oath having engaged in prostitution. On June 21, 1982, respondent pled guilty to two counts of misdemeanor prostitution. At his deposition 6 months later, respondent repeatedly denied giving anyone money in exchange for sexual acts. He stated that he loaned the young men money and that he had sexual contact with them, but he denied that one was in exchange for the other. At the hearing before the panel, 5 months after the deposition, respondent admitted that he paid money for sexual services. He testified that he would never again engage in prostitution.

Our system of justice depends upon people telling the truth under oath. If witnesses do not testify truthfully under oath, the justice system will be unable to function. If a judge, who has a professional duty to act in a manner that promotes public confidence in the judiciary, gives false testimony under oath with impunity, we can hardly expect the public to take seriously the oath to tell the truth.

An entirely different charge against respondent was an alleged violation of Minn. Stat. § 546.27, subd. 1 (1982), a statute that provides that a judge shall not be paid his salary unless he submits a voucher therefor accompanied by a certificate of full compliance with another statute requiring disposition of pending cases within 90 days. The required certification was printed on the back of respondent's payroll checks, with an endorsement stating: "Endorse-

---

8. Illustrative of this court's prior evaluation of the Board's findings under the "clear and convincing" rule of evidence is *In re McDonough*, 296 N.W.2d 648, 691–695, 698 (Sheran, C.J., concurring in part, dissenting in part), 699 (Stone, J., concurring specially) (Minn.1979).

ment shall constitute the payee's certificate of eligibility under the applicable statutes." In negotiating his checks, respondent signed his name but struck the printed certification. Notwithstanding evidence of some mitigating circumstances, the panel and the Board found that respondent violated the statute.

 We conclude that the evidence of respondent's prostitution activities, wholly apart from violations of other statutes,[9] is sufficient to justify the Board's recommendation of discipline.

Respondent, contending that there should be no discipline or no more than a censure, argues that his conduct was purely private and, but for a public disclosure by the television media, would not have brought the judiciary into disrepute, prejudicing the administration of justice. Contrary to his assertion, respondent's conduct was not purely private. He openly solicited prostitutes in a public place, a place notoriously frequented by young prostitutes. By disclosing his identity and his judicial position to the prostitutes, moreover, he made even greater the risk of discredit both to himself and the judiciary. He told them his name, gave them his telephone number on slips of paper bearing his name, and wrote them personal checks that were cashed in public places. One prostitute was so impressed that he brought another to respondent's home to prove that he knew a judge. Respondent welcomed one of the prostitutes to his judicial chambers for social visits.

Respondent strongly argues that removal would be impermissibly severe in view of the censure imposed 4 years ago in the case of Judge Walter Mann. *See In re Mann,* No. 50982 (May 4, 1980). Respondent's assertion that he should be subject to a sanction similar to that imposed on Judge Mann assumes that the situations are the same. The cases are similar to the extent that both involved acts of prostitution made public by investigative reports in the public media. The similarity ends there. Upon inquiry by the Board, Judge Mann immediately acknowledged the truth of the investigative report and entered into a stipulation for the imposition of censure as discipline. By this stipulation, Mann admitted that he had engaged in prostitution with one person, a 26-year-old woman, "10 times or better" during a 1-year period.[10] While Judge Mann's prostitution activities occurred in a private place, respondent's conduct involved solicitation of prostitutes in Loring Park, a public place. Respondent participated in prostitution with several more prostitutes over a long period of time and, more importantly, did so with at least one person under the age of 18, constituting contributing to the delinquency of a minor in violation of Minn. Stat. §§ 260.015, subds. 2, 5(a), 260.315 (1982). Unlike the offense of prostitution, where mistake of age is a defense to a felony prosecution, *see* Minn.Stat. § 609.-325, subd. 2 (1982), there is no defense based on lack of knowledge as to actual age for contributing to the delinquency of a minor. What is critical is not what the statutes provide with respect to criminal responsibility but what the standards of ethical responsibility require of a judge. The most crucial aspect of this sordid affair is that respondent sought out and exploited vulnerable young persons. His expressed caution about their age was apparently

---

9. Another statute admittedly violated in the course of the prostitution is the sodomy statute, Minn.Stat. § 609.293 (1982). Because we rest our decision wholly on respondent's participation in prostitution, we need not accept the invitation of amici curiae to address the constitutionality of the sodomy statute. It is fundamental that we, like the United States Supreme Court, address constitutional attacks on statutes only when absolutely necessary to the resolution of the case. *Federal Communications Commission v. Pacifica Foundation,* 438 U.S. 726, 734, 98 S.Ct. 3026, 3032, 57 L.Ed.2d 1073 (1978);

*Wegan v. Village of Lexington,* 309 N.W.2d 273, 279 (Minn.1981). Moreover, at oral argument, counsel for respondent acknowledged that this case could be decided without deciding the constitutionality of the sodomy statute.

10. It may well be that in *Mann* we should not have so summarily confirmed the stipulation for discipline no more severe than public censure, but respondent surely did not act in reliance on *Mann,* and we will not perpetuate it.

only to protect himself from engaging in conduct constituting a felony instead of a misdemeanor, not concern for the welfare of the young persons.

As respondent stated at the time he pled guilty to the criminal charges, "the painful fact is that I have violated a law that I took an oath to uphold. I truly am sorry that I did so. And I give the assurance that it never shall happen again. Now, I must live with the consequences, whatever they may be."

### Judgment of Discipline

The Board recommended to this court that respondent be removed from office and be assessed $43,000 in costs and expenses for these proceedings.

We reject the assessment of costs and expenses as unauthorized by the Rules of Board on Judicial Standards. Although Rule 10(d)(7) authorizes the assessment of costs and expenses as a sanction, Rule 11 explicitly provides that the items of costs and expenses assessed by the Board are not authorized: Rule 11(a) provides that witness expenses shall be borne by the party calling the witness, with exceptions not here applicable; Rule 11(b) provides a transcript of the proceedings to the subject judge without cost; and Rule 11(c) states that all other costs of the proceedings shall be at the public expense.

We accept the Board's recommendation of removal.

It is the order and judgment of this court that respondent, Robert Crane Winton, Jr., be and hereby is removed from his office as district court judge.

AMDAHL, C.J., and TODD, J., took no part in the consideration or decision of this case.