**In re Complaint Concerning the Honorable Alberto O. MIERA, Judge of District Court, Ramsey County, State of Minnesota.**

No. C6–87–1712.

Supreme Court of Minnesota.

July 5, 1988.

Betty Shaw, Sr. Asst. Director, Office of Lawyers Professional Responsibility, St. Paul, Robert J. Sheran, Denise D. Reilly, Board of Judicial Standards, Minneapolis, for appellant.

John C. McNulty, Marcy S. Wallace, St. Paul, for respondent.

POPOVICH, Justice.

This proceeding arises from a formal complaint filed August 31, 1987, by the Minnesota Board on Judicial Standards against the Honorable Alberto O. Miera, Judge of District Court, Ramsey County, alleging violations of the Canons of Judicial Conduct and the Rules of the Board on Judicial Standards. Following a hearing held between November 30, 1987, and December 18, 1987, a three-judge panel appointed by this court found Judge Miera had violated Canons 1 and 2 of the Code on Judicial Conduct and Rule 4 of the Board.[1] Specifically, the panel found there was clear and convincing evidence that:

(1) On two separate occasions while staying at the apartment of his court reporter, Neil Johnson (hereinafter "Johnson"), Judge Miera entered the room where Johnson was sleeping, lay down next to Johnson, and touched Johnson's back against Johnson's wishes. Judge Miera later told Johnson that some day the two of them would have sexual relations;

(2) Judge Miera kissed Johnson on the lips in Miera's court chambers without Johnson's consent;

(3) Judge Miera touched the shirt pocket over a female court employee's breast while offering coins as payment for coffee;

(4) While eating a banana, Judge Miera asked female court employees, "Do you people eat bananas for the vitamins or for the phallic symbol?"; and

(5) Judge Miera made public comments to the news media that certain Ramsey

---

1. The applicable provisions provide:
   Canon 1, Code of Judicial Conduct:
   An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
   Canon 2 A, Code of Judicial Conduct:
   A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Rule 4, Rules of the Board on Judicial Standards:
(a) Grounds for discipline shall include:
    \*    \*    \*    \*    \*    \*
  (3) Willful misconduct which, although not related to judicial duties, brings the judicial office into disrepute;
  (4) Conduct prejudicial to the administration of justice or conduct unbecoming a judicial officer, whether conduct in office or outside of judicial duties, that brings the judicial office into disrepute;
  (5) Any conduct that constitutes a violation of the code of judicial conduct or professional responsibility.

County judges were "bloodthirsty hypocrites." [2]

The panel also found that Johnson was sometimes discourteous and disrespectful to Judge Miera, kept short hours, allowed private business to interfere with his work, and that Judge Miera did not satisfactorily explain why Johnson was not summarily fired.

The Board on Judicial Standards recommends that Judge Miera be removed from judicial office. In addition, the Lawyers Professional Responsibility Board (LPRB) has recommended that Judge Miera receive a public reprimand as an attorney, based solely upon the incidents involving Johnson. We hold Judge Miera's conduct warrants a public reprimand in his capacity as an attorney, public censure in his capacity as judge, and a one-year suspension, without pay, from judicial office effective from the date of this opinion.

### I.

Alberto O. Miera was appointed a municipal court judge for Ramsey County in August, 1983, elected in November 1984, and by unification with the district bench became a district court judge in 1986. His term of office expires as of the first Monday in January, 1991. The facts giving rise to these proceedings are as follows:

*Incidents Involving Neil Johnson*

On March 10, 1984, Neil Johnson began work as Judge Miera's court reporter. Soon after Johnson was hired, Judge Miera and Johnson began socializing together, including playing raquetball, running, and going out to lunch. Johnson ate dinner with Judge Miera and his wife at Miera's home on several occasions. In April or May, 1984, while discussing his marital problems, Judge Miera informed Johnson he was bisexual.

On two occasions in May, 1984, Judge Miera stayed overnight at Johnson's apartment. Johnson was then separated from his wife and lived alone. Johnson and Judge Miera provided different accounts of the overnight stays. Johnson testified on the first occasion Judge Miera came to his single-bedroom apartment and asked to stay because he was having an argument with his wife. Johnson agreed and Judge Miera slept in the bedroom while Johnson slept on the floor in the living room. Johnson testified Judge Miera got up during the night, lay down next to Johnson and touched his back. When Johnson asked him what he was doing, Judge Miera got up and returned to the bedroom. Johnson testified the next morning Judge Miera told him they would have sexual relations someday and Johnson replied that it would not happen. The following week, Judge Miera stayed at Johnson's apartment again. Johnson testified Judge Miera again lay down next to him during the night and, when asked what he was doing, returned to the bedroom. Judge Miera admitted staying at Johnson's apartment on two occasions, but denied that on either occasion he lay next to Johnson or told him they would have sexual relations.

On the evening of July 26, 1984, Judge Miera called Johnson and told him he was contemplating suicide. Johnson went to Judge Miera's home and, according to Johnson, Judge Miera made sexual overtures, including attempting to unbuckle his

---

**2.** In its findings, the panel also found several allegations in the formal complaint were not supported by clear and convincing evidence. Allegations found not to be supported by the evidence included:

(1) An allegation that Judge Miera attempted to unbuckle Johnson's pants at Miera's home on or about July 26, 1986;

(2) An allegation that Judge Miera improperly retained another judge's law clerk as an attorney to represent him on a motion in Judge Miera's marriage dissolution;

(3) An allegation that Judge Miera improperly presided over the sentencing of a criminal defendant represented by an attorney simultaneously representing Miera in his marriage dissolution; and

(4) An allegation that Judge Miera made public comments that certain Ramsey County judges were racists or were racially motivated.

The panel further found that Judge Miera's comments regarding his shaken belief in the system of justice following the return of an adverse jury verdict in a related civil case did not violate the Canons of Judicial Conduct or the Rules of the Board. The Board does not dispute these findings.

pants, during several hours of discussion concerning Judge Miera's marital and personal difficulties. Judge Miera testified he called Johnson while contemplating suicide, but denied making sexual overtures. According to Judge Miera, the two did engage in a mutual nonsexual embrace. The panel found there was not clear and convincing evidence to support Johnson's allegation that Judge Miera made sexual advances during the discussion, and the Board does not dispute this finding.

Following the suicide discussion, the work relationship between Judge Miera and Johnson became strained. According to Johnson, in December 1984, Judge Miera called him into chambers and began discussing their problems. Johnson testified when he attempted to terminate the conversation, Judge Miera got up from his desk as if to leave, but then quickly turned and kissed Johnson on the lips. Johnson testified he quit his employment with Judge Miera on January 11, 1985, as a result of the kiss.

During the summer of 1985, Johnson agreed to return as Judge Miera's court reporter in September of that year. He quit in October, 1986, alleging Judge Miera continued to make sexual advances and pursue a social relationship with him.

### Shirt-pocket Incident

In May or June, 1986, Judge Miera was assigned to hear proceedings at the Ramsey County Courthouse located in Maplewood, Minnesota. One day Judge Miera entered the clerk's office during a court recess. Jacqueline Kendall, a Ramsey County Court employee, and her supervisor, Roberta Weltzin, were present. Kendall was wearing a cotton blouse with pockets on the front. Judge Miera approached Kendall and, while offering payment for coffee, reached for a shirt pocket over her breast as if he might drop some change in, opened the flap, and touched the shirt. Kendall considered the touching unwelcome.

### Banana remark

During the summer of 1986, Judge Miera was assigned to hear proceedings at the Ramsey County Courthouse located in White Bear Lake, Minnesota. On one occasion, Judge Miera entered the clerk's office. Four female court employees were present. While eating a banana, Judge Miera inquired, "Do you people eat bananas for the vitamins or for the phallic symbol they represent?" One employee testified the comment was made to all those present and was not a sexual advance. The employee, however, also testified the comment was shocking. Another employee testified she was embarrassed by the remark.

### "Bloodthirsty hypocrites" comment

After leaving employment as Judge Miera's court reporter, Neil Johnson filed a civil lawsuit against Judge Miera. Following a jury verdict adverse to Judge Miera, a resolution was passed by the judges of the Ramsey County bench requesting that the Minnesota Supreme Court remove Judge Miera from judicial office pending discipline proceedings. After the resolution was made public, a representative of the news media telephoned Judge Miera at home to get a response. Judge Miera told the reporter that certain unnamed judges in Ramsey County were "bloodthirsty hypocrites."

## II.

▮ The standard of proof in judicial and attorney disciplinary proceedings requires full, clear and convincing evidence. *In re Gillard*, 271 N.W.2d 785, 805 n. 3 (Minn.1978). *See also In re McDonough*, 296 N.W.2d 648, 691 (Minn.1979). Satisfaction of this standard requires more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn. 1978). Clear and convincing proof will be shown where the truth of the facts asserted is "highly probable." *Id.*

▮ 1. Judge Miera argues the panel's findings that he made unwelcome sexual advances toward Johnson are not supported by clear and convincing evidence, as Johnson's testimony was uncorroborated. While previously discussing the need for

corroboration in judicial disciplinary proceedings, we have stated:

> The clear and convincing standard arises from an appreciation of the gravity of a disciplinary proceeding and the magnitude of the loss to which a disciplined judge is subjected. No mechanistic corroboration requirement is necessary; uncorroborated evidence may be clear and convincing if the trier of fact can impose discipline with clarity and conviction of its factual justification. In fact, depending on its source, uncorroborated evidence may be more reliable than that remotely corroborated by a dubious source.

*In re McDonough*, 296 N.W.2d at 692. Although we have declined to require corroboration in all cases, we have looked for corroborating evidence where the allegations resulting in disciplinary proceedings are possibly the result of mistake. *See Id.* at 694. This concern, however, is not present in the current proceeding. The panel found (1) on two occasions, while staying at Johnson's apartment, Miera lay down next to Johnson and touched Johnson's back against Johnson's wishes; (2) Miera told Johnson that some day the two of them would have sexual relations; and (3) Miera kissed Johnson on the lips in Miera's court chambers without Johnson's consent. The incidents involving Johnson are not subject to mistake.

Moreover, several witnesses corroborated Johnson's testimony. Paula Berg, a friend of Johnson, testified Johnson told her in January, 1985, that Judge Miera had kissed him. Similarly, another friend of Johnson, Ellen Seesel, testified at the related civil trial Johnson told her in December, 1984, or January, 1985, that Judge Miera kissed him.[3] Both women also testified Johnson informed them of one occasion when Judge Miera stayed at Johnson's apartment, lay next to Johnson during the night, and touched Johnson without his consent. In addition, Raymond Farrell testified Johnson told him Judge Miera had made sexual advances, while another witness, Mark Haakinson, testified that in July, 1986, Johnson told him Judge Miera had tried to kiss him.

Kathleen Conlee, a friend and co-worker of Johnson, testified that in June, 1984, Johnson told her things were not going well at work and Judge Miera had made sexual overtures, stating he and Johnson would have sexual relations someday. Johnson also told Conlee about one occasion where Judge Miera lay down next to him and touched his back while staying at Johnson's apartment. Although no witnesses corroborated Johnson's testimony that Judge Miera lay next to him during two overnight stays, Judge Miera testified he stayed at Johnson's apartment on two occasions.

We hold there is clear and convincing evidence to support the panel's findings regarding the incidents involving Judge Miera and Neil Johnson. Johnson's testimony was buttressed by the corroborating testimony of several witnesses. Moreover, while the court makes an independent review of the evidence in judicial disciplinary proceedings, we are sensitive to the fact the panel had the opportunity to view the witnesses as they testified and is therefore in a superior position to assess credibility.

2. Judge Miera next argues the evidence does not support the panel's finding that the testimony provided by psychiatric experts, concerning whether or not Judge Miera and Neil Johnson were telling the truth, was inconclusive.

Judge Miera presented the testimony of Dr. Paul Meehl. Dr. Meehl testified he had examined and tested Judge Miera and found the results to be normal. Dr. Meehl also interviewed Johnson and interpreted a Minnesota Multiphasic Personality Inventory (MMPI) completed by Johnson. As a result of the interview and MMPI, Dr. Meehl determined that Johnson suffered from a personality disorder known as antisocial personality. Dr. Meehl testified Johnson's MMPI results placed him in the top one percent of the population on the "psychological deviate scale." Dr. Meehl

---

3. A large portion of the transcript of the civil trial in the case of *Johnson v. Ramsey County*, involving the same incidents, was submitted into the record of the current proceeding.

testified that as a result of his examination he doubted Johnson's honesty. Dr. Meehl's determination was supported by the testimony of a second expert, Dr. James Butcher, who testified Johnson's MMPI reflected a psychopathic personality.

Johnson presented the testimony of two expert witnesses. Dr. Lorna Anderson, a psychologist, testified she examined Johnson on four occasions. Although she diagnosed Johnson as having a passive-aggressive personality disorder, characterized by manipulative behavior, she testified she believed Johnson was telling the truth regarding the incidents involving Judge Miera.

Dr. Maurice Martin also testified on Johnson's behalf. Dr. Martin examined Johnson in November, 1987, and administered a second MMPI. Dr. Martin testified he determined "there was no psychiatric diagnosis of consequence." While Johnson's second MMPI reflected a considerably lower score on the psychological deviate scale than the first, the tests were scored using different methods, apparently making comparison difficult.

Dr. Anderson opined the presence of rage could explain Johnson's extremely high score on the psychological deviate scale on the first MMPI. Dr. Martin testified it is not possible to form a judgment regarding an individual's truthfulness on the basis of an MMPI alone.

The opposing testimony of Drs. Meehl and Butcher and Drs. Anderson and Martin provides a basis for the panel's determination that the psychiatric evidence was inconclusive.

3. Judge Miera next contends the panel erred in failing to admit the testimony of Dr. John Broadhurst, a physics professor at the University of Minnesota with special expertise regarding the motion and mechanics of the human body. While Dr. Broadhurst was allowed to testify generally about the movement of the body, the panel sustained an objection to a question eliciting Dr. Broadhurst's expert opinion whether the alleged kiss could have occurred as Johnson described it.

In judicial disciplinary proceedings, the panel's function is to develop the most complete record possible upon which the Board on Judicial Standards' recommendation and this court's decision may rest. This function is most effectively carried out through a liberal construction of the rules of evidence. The failure to admit this evidence does not require further proceedings, however. Because this court makes an independent review of the record, the failure to admit the opinion may be corrected upon review. *See In re Gillard,* 271 N.W.2d 785, 811 (Minn.1978). For this reason, the panel's failure to receive Dr. Broadhurst's opinion at most is harmless error.

### III.

Is the conduct found by the panel judicial misconduct? Judges must conform to a higher standard of conduct than is expected of lawyers or other persons in society. *Complaint Concerning Winton,* 350 N.W. 2d 337, 340 (Minn.1984). Canon 1 of the Code of Judicial Conduct requires this high standard "so that the integrity and independence of the judiciary may be preserved." Under Canon 2A, judges must "respect and comply with the law" and act "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The legal system depends on public confidence in judges, whose power rests in large measure on the ability to command respect for judicial decisions. Whether or not directly related to judicial duties, misconduct by a judge brings the office into disrepute and thereby prejudices the administration of justice. *Winton,* 350 N.W.2d at 340.

1. Judge Miera's advances toward Neil Johnson were clearly of a sexual nature and just as clearly unwelcome. Besides kissing and touching Johnson, Judge Miera insisted the two would one day have sexual relations. Miera contended at oral argument, "[T]here's no harm in asking," but, in these circumstances, we disagree. Johnson was an employee, not simply a personal friend. Moreover, he was a court reporter, a close personal assistant who serves at the

judge's discretion. Both the judicial office and the unique relationship between judge and reporter make this employee particularly vulnerable to abuse of power. It is disingenuous to assert Johnson could simply say "no." In fact, the record shows he did just that, to no avail.

Judge Miera stresses the panel made no findings of interference with employment or creation of a hostile work environment, as required for a claim of sexual harassment under Minn.Stat. § 363.01, subd. 10a(3) (1986). We need not decide whether Judge Miera's conduct violated that statute. The issue before us is not Judge Miera's civil liability for damages but his ethical responsibilities as a judge. The facts found by clear and convincing evidence demonstrate a serious abuse of the power inherent in Judge Miera's position. That conduct jeopardizes confidence in the integrity of the judiciary and brings the office into disrepute. Courts in other jurisdictions have reached similar conclusions, imposing discipline for unwelcome sexual advances even outside an employer-employee relationship. *See, e.g., Matter of Seraphim,* 97 Wis.2d 485, 294 N.W.2d 485 (1980), *cert. denied* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (judge harassed several women encountered in the courthouse and at social functions); *In re Kivett,* 309 N.C. 635, 641, 309 S.E.2d 442, 446 (1983) (judge suggestively touched female probation officer); *In re Stevens,* 28 Cal.3d 873, 172 Cal.Rptr. 676, 625 P.2d 219 (1981) (judge solicited sexual activity with a married couple, which became widely publicized). Judge Miera's unsolicited advances toward his own court reporter constitute a more egregious breach of trust and judicial integrity.

■ 2. The panel's other findings of sexual misconduct are less substantial. On one occasion, Judge Miera approached a female court employee during recess in proceedings and, in offering coins to pay for coffee, "reached over, flipped one of the flaps open [on her shirt pocket] and touched the shirt." At another time, in a different Ramsey County courthouse, Judge Miera began eating a banana offered by a female court employee and asked, "Do you people eat bananas for the vitamins or for the phallic symbol?" We agree with the Board that such conduct is embarrassing and inappropriate for a judge. At the same time, we cannot say the incidents were willfully offensive or represented a sexual advance of some kind. Rather, both incidents seem intended as slightly risque humor, though out of place and ill-conceived.

We do not suggest humorous intent excuses misconduct. *Compare Gonzalez v. Commission on Judicial Performance,* 33 Cal.3d 359, 376, 188 Cal.Rptr. 880, 890, 657 P.2d 372, 381–82 (1983), *appeal dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984) (judge disciplined for sexual remarks and facially blatant ethnic slurs, even if made in jest). In our view, though, the "shirt incident" and "banana remark" were not so patently offensive that, standing alone, they rise to the level of judicial misconduct. Moreover, this behavior showed less potential for abuse of authority, as it involved personnel with whom Judge Miera had no direct supervisory power and only casual contact. Nor, from the record, were these acts ever repeated. By themselves, the incidents would not warrant discipline.

■ 3. The final allegation of misconduct is Judge Miera's statement to a reporter on learning that Ramsey County judges had voted to seek his removal from the bench. Judge Miera called the judges "blood-thirsty hypocrites" and said he was "never accepted as a colleague." The statement was reported on local television news broadcasts.

The Board contends this statement engenders contempt and disrespect for the judiciary, violating Canons 1 and 2 of the Code of Judicial Conduct. We think Judge Miera's comment must be read in the context of this entire regrettable affair. Judge Miera was the defendant in a civil lawsuit brought by Neil Johnson. Upon announcement of the trial verdict for Johnson, and before the case was considered on appeal, Judge Miera's colleagues began efforts to remove him from the bench pending final determination. The judges were

perhaps well-intentioned, but their unorthodox method of action—a petition to this court and statements to the news media— seems destined to spark a response. Correct procedure would have been for the judges to complain to the Board on Judicial Standards pursuant to Rule 2, Rule 5 relating to confidentiality, and Rule 7 relating to interim sanctions.

Judges, like other citizens, will occasionally become involved in civil litigation. Like any litigant, they are entitled to let the action run its course, even if they simultaneously face separate disciplinary proceedings. Judge Miera's colleagues publicly commented on his position as a defendant in a pending action. In a dismaying lapse of discretion, one even hosted a victory party in chambers to celebrate Johnson's trial verdict.

In this light, Judge Miera's outburst is at least understandable. We cannot condone the judge's language, and he certainly could have communicated his position in a more careful, reasoned fashion. But we do not find his remarks equivalent to an unprovoked, disrespectful attack on the judiciary. *See, e.g., In re McDonough*, 296 N.W.2d 648, 670–71, 694–95 (Minn.1979) (judge disciplined for, among other things, abusive statements to his chief judge).

The situation is somewhat analogous to *In re Kelly*, 238 So.2d 565 (Fla.1970), *cert. denied* 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed. 2d 246 (1971), *reh'g denied* 403 U.S. 940, 91 S.Ct. 2245, 29 L.Ed.2d 720, where a presiding judge's colleagues sought his removal, and the judge in turn went to the press with criticism of the court system and a petition for reform. The court, by a 4-to-3 vote, found Judge Kelly subject to discipline, but we are persuaded by the dissent's reasoning that a judge in Kelly's position has "a kind of 'qualified privilege,' to borrow a phrase from the law of libel, to publicly explain his side of the affair in moderate, unmalicious, and unabusive language." *Id.* at 575 (Ervin, C.J., dissenting). Judge Miera approached the outer boundaries of this privilege, but avoided abusive, profane, and personal attacks in his brief comments on the removal petition.

Judge Miera also asserts a first amendment right to his public remarks. While we need not reach that claim, we recognize potential constitutional problems in grounding discipline on public speech. Indeed, the *Kelly* dissenters maintained that a judge subject to election and aggrieved by events affecting his public stature does not have to stand mute merely because he is a judge; rather, the "constitutional scheme of free expression" guarantees his right to publicly explain his actions. *Kelly*, 238 So.2d at 575. In the same vein, one commentator suggests judicial speech on a matter of public concern may be subject to discipline only if harm to the judicial system outweighs the benefits produced by the speech. Gross, *Judicial Speech: Discipline and the First Amendment*, 36 Syracuse L.Rev. 1181, 1228 (1985). *See generally Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). We simply note these constitutional questions, but need not answer them as Judge Miera's isolated remark does not warrant discipline. *See In re Snyder*, 472 U.S. 634, 642–43, 105 S.Ct. 2874, 2879–80, 86 L.Ed.2d 504 (1985).

4. Our disposition of this case is limited to the specific charges made and the record before us. We take note, however, that on March 9, 1988, the parties appeared before us on the Board's motion to suspend Judge Miera pending final disposition by this court. At that time both parties submitted transcripts of a meeting between Judge Miera and the chief judge of the Ramsey County District Court, held on January 8, 1988, at the Ramsey County Courthouse. Also present at the meeting were the judicial administrator and the assistant judicial administrator. The topic of discussion was whether the chief judge could revoke Judge Miera's court assignment, Judge Miera contending the chief judge lacked authority to do so.

We are not concerned here with the merits of the dispute over the court assignment. No charges have been brought arising out of the encounter and the matter has not been briefed nor argued. But the

transcript does reflect Judge Miera's continued judicial demeanor with respect to some of the charges that are properly before us, and, to that limited extent, the transcript is not without relevance.

At the January 8, meeting, Judge Miera said to the chief judge, "I think it's totally inappropriate to continue seeing the blood-thirsty hypocritical manner as has been indicated in the last year." He also stated during the course of the meeting that he would not follow the established procedures for appealing the revocation of the court assignment but would express his disagreement in other ways and would continue with the assignment. While these statements were made in a judicial conference and not said in a public forum, we are troubled by the repetition of the "blood-thirsty hypocritical" accusation.

The public expects judges to put aside their personal concerns to the extent necessary to decide cases that come before them fairly and impartially. However sincere Judge Miera may feel about his views, when a judge's behavior is inconsistent with these expectations, the public's confidence in the judiciary is eroded, including confidence in the judge who makes the accusations in an intemperate, unjudge-like manner.

In disciplinary matters, we have taken into account whether the respondent "considers himself obligated to conform to the canons of ethics." *See, e.g., In re Franke,* 345 N.W.2d 224, 230 (Minn.1984) (lawyer discipline case). Regrettably, the renewed outburst of January 8 suggests Judge Miera's concern for the importance of showing respect for the judicial system is not what it should be.

## IV.

■ The remaining question is what discipline to impose. The Board recommends public censure and removal from office. After careful review of the entire record, we decline to follow that recommendation completely.

Our decision is guided by the purpose of disciplinary action, which is to protect the public by insuring the integrity of the judi-cial system. The sanction must be designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future. We act not to punish the wrongdoer but to restore public confidence in the system and its officers. *See Gillard,* 271 N.W.2d at 812; *see also In re Kneifl,* 217 Neb. 472, 485–86, 351 N.W.2d 693, 700 (1984).

Judge Miera's unsolicited advances toward a close personal assistant represent an unacceptable abuse of official position. That Johnson apparently deserved discharge for his poor employment record in no way excuses Judge Miera's behavior. Even in the best light, the interaction with Neil Johnson shows gross insensitivity to Johnson's vulnerable position and the judge's own required high standards of conduct. While the other incidents with court employees do not merit severe discipline by themselves, they contribute to the lessening of public confidence in the judiciary.

As to Judge Miera's admittedly intemperate comments about his judicial colleagues, in fashioning a sanction we look foremost to the conduct that triggered this disciplinary action, not to Judge Miera's defensive rhetoric uttered in the heat of public accusations against him. However, Miera's intemperate interactions with his chief judge make us, and perhaps the public, question whether he appreciates his obligation to maintain a judicial demeanor even under trying circumstances.

Our decision is limited to the record of the disciplinary proceedings below. Rules of Board on Judicial Standards, 13(f). We may consider matters outside that record only after remand to the Board for further proceedings, or if both parties have notice and an opportunity to be heard regarding supplementary material. *Id.,* 13(d)(1), (3). Though the media have reported other activities and statements by Judge Miera, the Board's counsel at oral argument expressly waived a request for remand, asserting the record is adequate to support its recommendation. The Board's position was that the time has come to bring this matter to a

close. We completely agree. At the same time, Judge Miera has had no opportunity to be heard on any claims not raised at the 1987 panel hearing. Wide publicity about his actions in the intervening months does not free us from the requirements of due process and the Board's own rules. The sanction we impose is based solely on the record of misconduct before us.

In our view, discipline short of removal will serve the purposes of this proceeding. We find public censure and a one-year suspension from office adequately convey the importance of the ethical violation. It should be understood from this sanction that we, and the citizens of this state, will not tolerate improper sexual advances by judges bound to "the highest standard of personal and official conduct." *Winton,* 350 N.W.2d at 340.

Judge Miera argues any sanction more severe than public reprimand is unwarranted, given our previous disposition of disciplinary complaints involving sexual misconduct. He points to our public censure of Judge Walter Mann for dealing with an adult prostitute, and public reprimand of Judge Darrell Sears for, among other things, sexual advances to court employees and attorneys. *See In re Mann,* No. 50982 (March 5, 1980); *In re Sears,* No. 81–1264 (July 28, 1982). In both cases, though, we affirmed a stipulation without opinion, and we have since expressed reservations about summarily endorsing Judge Mann's modest sanction. *Winton,* 350 N.W.2d at 343, n. 10. The Sears case is complicated by that judge's severe drinking problem, and our action there should not be read as precedent for the proper disciplinary response to sexual misconduct by a judge. To the extent the case suggests otherwise, we will not perpetuate it. *See id.*

We accept the recommendation of the Lawyers Professional Responsibility Board that Judge Miera also be publicly reprimanded as an attorney. The LPRB cites only the incidents involving Neil Johnson, which allegedly violate the lawyer's duty to avoid "conduct that adversely reflects on his fitness to practice law." Minn.Code Prof.Resp., DR 1–102(A)(6).

As an attorney, Judge Miera is not held to the same high standards as a judge. Nevertheless, the abuse of power that concerns us in the judicial context is no less troubling when engaged in by an attorney. Miera imposed himself on a vulnerable employee. Whether or not his conduct technically constitutes sexual harassment under Minn.Stat. § 363.01, it shows at least indifference to his legal and ethical obligations. Such conduct adversely reflects on his fitness to practice law, and a public reprimand is warranted.

As we indicated in *In re Snyder,* 336 N.W.2d 533, 536 (Minn.1983), and *McDonough,* 296 N.W.2d at 696, this court has the authority to reject or modify recommendations of the Board. After lengthy deliberation, we will not now remove Judge Miera from the bench. The discipline being ordered here is sufficient for protection of the public. After one year's absence Judge Miera can resume his judicial duties and will be able to serve more than a full year before standing for reelection in 1990 if he chooses to run. The citizens of Ramsey County know him and his work and are in a position to evaluate his performance. They can remove him by ballot if they determine we have been too lenient. There has been serious misconduct present in this case. Public censure, forfeiture of his salary for one year, and suspension for one year is sufficient for protection of the public interest and to restore confidence in the judiciary. It will also permit a time for healing of the wounds of all of the parties and any necessary rehabilitation.

Judge Alberto O. Miera is hereby publicly censured for judicial misconduct and suspended from judicial office, without pay, for one year. He is also publicly reprimanded as an attorney.

WAHL, Justice (concurring in part, dissenting in part).

I agree that the evidence supports a finding of judicial misconduct. The making of unsolicited sexual advances by a judge toward the judge's own court reporter demonstrates a serious abuse of the power inherent in the judge's position. In my

view, however, we have no precedent for the severity of the ordered discipline based on the facts of the case. To be sure, we must determine an appropriate discipline by measuring the misconduct against the ethical standards contained in the Code of Judicial Conduct but we must, just as surely, compare that misconduct to the misconduct in other cases where this court has been called to discipline judges.

We have ordered only public censure where a judge admitted paying for sex with a prostitute as well as making public statements to the press regarding his involvement. *In re Mann*, No. 50982 (Minn., March 4, 1980) (unreported Supreme Court order). We ordered public reprimand where a judge conducted judicial business while inebriated on several occasions, at times failed to conduct business because of inebriation, and sexually harassed and embarrassed female employees and female attorneys on repeated occasions by making suggestive comments or kissing and touching female staff. *In re Sears*, No. 81–1262 (Minn., July 26, 1982) (unreported Supreme Court order). That these earlier cases affirmed stipulations, or that one case involved alcoholism, in no way assured that public confidence in the impartiality and integrity of the judicial system was any less harmed than in the present case. Even with our statement that our action in those cases should not be read as precedent for the proper disciplinary response to sexual misconduct by a judge, the fact remains that our treatment of the judges involved in those cases was far more lenient than suspension from judicial office without pay for one year. Though suspension from office may be warranted, a shorter period of time would be sufficient for protection of the public interest.