**In re Honorable Frank A. CONARD, Respondent.**

No. 79212.

Supreme Court of Missouri, En Banc.

April 29, 1997.

Rehearing Overruled May 27, 1997.

James M. Smith, St. Louis, for Informant.

Rollin J. Moerschel, Matthew J. Fairless, St. Charles, for Respondent.

## ORIGINAL DISCIPLINARY PROCEEDING

PRICE, Judge.

This is an unfortunate case in which two public officials, a circuit court judge and a city chief of police, failed to properly exercise their duties. While each saw the speck in the other's eye, each failed to see the log in his own. It is our responsibility to determine whether the judge should be subject to discipline. Under the unique facts of the case, we find that the judge was guilty of misconduct in his official duties and should be suspended from office without pay for thirty days.

### I.

During the evening of November 29, 1995, Judge Frank A. Conard received a telephone call regarding the arrest and incarceration of Mr. William Freeman from Mr. Freeman's attorney. Judge Conard was familiar with Mr. Freeman and his attorney only because he had presided over Mr. Freeman's divorce a few months earlier.

Freeman had been arrested for domestic abuse while attempting to pick up his children from his former wife. It was the unwritten policy of the St. Charles police department to hold persons arrested for domestic violence for twenty hours as allowed by section 544.170, RSMo 1994.[1] After the attorney related the facts of the arrest and detention to Judge Conard, the Judge determined that continued detention was not necessary. He contacted the St.

---

1. The text of Section 544.170, RSMo 1994, reads:
 All persons arrested and confined in any jail, calaboose or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of some credible person, and be held by warrant to answer to such offense; and every such person shall, while so confined, be permitted at all reasonable hours during the day to consult with counsel or other persons in his behalf; and any person or officer who shall violate the provisions of this section, by refusing to release any person who shall be entitled to such release, or by refusing to permit him to see and consult with counsel or other persons, or who shall transfer any such prisoner to the custody or control of another, or to another place, or prefer against such person a false charge, with intent to avoid the provisions of this section, shall be deemed guilty of a misdemeanor.

Charles police department by telephone to obtain the immediate release of Mr. Freeman.

Judge Conard first spoke to Lieutenant Amendola, the watch commander on duty. Judge Conard requested the release of Mr. Freeman. Lt. Amendola informed the Judge that he was not familiar with "oral" releases and that he would have to contact the chief of police, David King. Lt. Amendola gave Judge Conard the chief's telephone number and then called the chief to inform him of the situation.

After speaking with Lt. Amendola, Chief King telephoned another St. Charles County Circuit Judge, William Lohmar. Although there is some dispute as to the details of the conversation, Judge Lohmar informed Chief King that Judge Conard was attempting to have Mr. Freeman released on an "appearance bond". Judge Lohmar testified that he told the chief that "they are not anything that's uncommon", however, Chief King further testified that Judge Lohmar indicated that the Circuit Court of St. Charles County did not "have appearance bonds anymore." Chief King next telephoned Captain Banas of the St. Charles police department. Captain Banas is an attorney and advised the chief that there was no legal authority for such a release. Captain Banas also testified that it was the unwritten policy of the St. Charles police department that "no person is entitled to release prior to the expiration of twenty hours and the judge has no authority to order such person released until such person is charged with a bailable offense."

At approximately 8:20 p.m., Judge Conard called Chief King. Judge Conard told Chief King that he wanted Freeman released. The two discussed the twenty hour hold. The Chief also indicated that he would not send a patrol car to Judge Conard's home to pick up a written order to release Mr. Freeman. Chief King did not tell Judge Conard that he had already spoken to Judge Lohmar. Chief King testified that at the end of the conversation it "got rather difficult in that the judge certainly insinuated if I didn't do what he was telling me to do that he was going to hold me in contempt of court."

Chief King then telephoned Judge Lohmar again. In the second conversation Judge Lohmar told Chief King that he could release Mr. Freeman if he got an appearance bond from Judge Conard. Chief King, however, testified that he understood Judge Lohmar to indicate that "we could continue to hold on to the individual under those circumstances."

Chief King then received a second telephone call from Judge Conard. Judge Conard informed the Chief that he was delivering written orders to the police station for the release of Mr. Freeman. The record is unclear on the precise conversation between the Judge and the Chief at this point. The Judge recalls that Chief King told him, "I don't care if your order is written or oral, I don't intend to follow it." Chief King acknowledged that he refused to release the prisoner.

Chief King then called Lt. Amendola. He told Lt. Amendola that Judge Conard was coming to the police station to deliver some papers. Amendola was instructed to make the Judge comfortable and let him know that King was on his way to the police station. Chief King further instructed Amendola not to release Mr. Freeman until King had an opportunity to review the papers. After speaking to Lt. Amendola, Chief King telephoned Corporal Bextermueller, the police department public affairs officer. He asked Bextermueller if he was aware of any prisoner being released on a verbal order. Bextermueller said that he was not. Chief King also indicated to Bextermueller that he might be going to jail. Corporal Bextermueller called Lt. Amendola for additional information. He then called the news media and advised "that we had a situation developing that the Chief of the St. Charles Police Department might be going to jail." Bextermueller testified before the disciplinary commission that "if the Chief was going to be going to jail that evening, I was of the impression or my opinion was I wanted it on the air."

At approximately 9:50 p.m., Judge Conard arrived at the police station. He first served Lt. Amendola with a written memorandum ordering the release of Mr. Freeman. Lt. Amendola refused to release Freeman. Am-

endola called the Chief and then informed Judge Conard that the Chief had requested that the Judge wait until the Chief could come to the station because he wanted to speak to Judge Conard before he released the prisoner. Judge Conard believed that this constituted contempt and served Lt. Amendola with a notice for him and Chief King to appear in court the next day to show cause why they should not be held in contempt. Judge Conard then left the police station. In the telephone conversation between Chief King and Lt. Amendola, Chief King asked "Is there anybody else there?" Amendola replied, "No sir, not at the moment." Chief King then said, "Too bad, okay, be there in a little while."

When Chief King arrived at the station, he reviewed the documents that Judge Conard had left. He then called Judge Lohmar a third time. Judge Lohmar recalls the conversation as follows:

I can remember, recall the Chief reading this to me and saying this doesn't comport with what I said an appearance bond, how it should read. And I just made the suggestion to him, Chief, you've got something in writing now, the Judge's signature is on it, release the guy and work it out in the morning. You are covered.

At 10:42 p.m., Chief King called Judge Conard. Chief King questioned whether the order was lawful and discussed the fact that the statute cited in the order, section 544.170, did not provide authority for an appearance bond. He also noted that the order did not contain a date, time, and place to appear. Part of the discussion that took place between the two individuals follows:

Judge Conard: Well, you know what, I don't have any options. You're telling me that you're going to decide what the law is, that you're going to do what you think you have to do and that you are going to ignore any order that I issue and I can't let that happen.

Chief King: As long as it's a lawful order, Frank, that's the distinction. Now there's a difference between an order and a lawful order or bond memorandum and an order that—

Judge Conard: That's what we'll litigate tomorrow at 8:00.

The discussion continued:

Judge Conard: Do you know how to get around that problem, really?

Chief King: How?

Judge Conard: You release the guy now. That's how you do it, very simple.

Chief King: And what happens if I release this guy?

Judge Conard: If he is released now, I'll consider that to be immediate and there's no appearance necessary.

Twice more, the Judge offered the compromise to the Chief:

You can either do one of the two things. You can inform me right now that he is going to be released now and I will say that that is still immediate even though it's an hour late. . . .

. . . Is he going to be released now or are you going to be in court tomorrow morning at 8:00.

The Chief finally accepted the offer stating:

Well, I'll release him, Frank. I'll release him because I've got to release him because I've got a wife who is ill. . . . I'll release him, Frank. . . . You told me to release him, I'll release him, Frank, okay?

Judge Conard then replied:

That's fine. Then we have no problem.

The Chief immediately released Mr. Freeman after the telephone conversation at approximately 11:00 p.m. At the same time, a number of news reporters arrived at the station. Corporal Bextermueller addressed the assembled media stating that Mr. Freeman would be released and that the Chief would not be going to jail that night. Corporal Bextermueller mentioned that Chief King did have a document indicating that he needed to appear the next morning in Judge Conard's court. Chief King also made a statement to the press. He indicated that he had been ordered to release Mr. Freeman. He further indicated that he had been ordered to appear the next morning in Judge Conard's court.

The next morning Chief King appeared at Judge Conard's court room. King was accompanied by St. Charles Sheriff, Douglas Saulters. Although Judge Conard was in his chambers at that time, his courtroom was dark and the door was locked. Judge Conard testified that since he had told King the night before that "he didn't have to appear. I didn't expect anybody to appear." No one notified Judge Conard that Chief King had come to the courthouse and a bailiff advised Chief King and Sheriff Saulters that the judge was not there. Chief King and Sheriff Saulters then left the courthouse.

Chief King later returned to the courthouse and granted an interview to a reporter. A transcript of that interview reveals the following statements,

Reporter: Chief, what do you think about your actions yesterday as it relates to a domestic violence case?

King: Well, I'd do them again if my actions are going to prevent the continuation of domestic violence, prevent someone from being battered, perhaps someone from being killed. I'm ready to do it again.

\* \* \* \* \* \*

Reporter: I've talked to a couple of attorneys and a prosecutor about this, and what they're telling me is that the judge was in the right and the—the judge was in the right and the police chief was in the wrong.

King: That may be their opinion. I've got other legal opinions that say I was in the right and that the request was inappropriate.

\* \* \* \* \* \*

Reporter: You don't regret at all what took place?

King: No.

Reporter: You're concerned about the person's well being?

King: My role in this, I don't regret my actions. And if this brings more attention to the issue of domestic violence, then so be it. I think we need to have the spotlight put on this terrible crime and to give it. . . .

Below are representative excerpts from other news reports broadcasted on November 30.

Reporter: . . . bizarre dispute at St. Charles almost lands the police chief behind bars. Circuit Court Judge Frank Conard orders Chief David King to release a domestic violence suspect. When the chief refuses the judge threatens to throw him in jail. Chief King met with reporters late last night. He says Judge Conard showed up with a court order demanding police release the suspect. King says he has no idea why the judge is taking a special interest in this case but he decided to comply.

Chief King: I've been advised to say only that the judge has ordered the release of the defendant and we're complying with that order.

Reporter: Chief King claims he still stands by his officers who arrested the suspect but he says he cannot risk going to jail because his wife is eight months pregnant.

\* \* \* \* \* \*

Reporter: A St. Charles man suspected of domestic violence is out of jail this morning following a dispute between a county judge and a police chief. St. Charles Police arrested a forty year old Augusta man last night following a fight with his ex-wife in her St. Charles home. Authorities say St. Charles County Judge Frank Conard ordered the suspect to be released immediately without giving a reason. St. Charles Police Chief David King says the judge told him that he would be jailed for contempt of court if he failed to follow orders.

Chief King: This is unusual. I've never been involved in anything like that, this before. But my duty if you will and my appearance needs to be available for my spouse.

Reporter: King says he complied with the judge's order because his wife is expecting a child and he didn't want to risk being thrown in jail. Judge Conard was unavailable for comment last night. Authorities say they will file domestic violence charges against the suspect today.

\* \* \* \* \* \*

Reporter: Colleen Freeman tells me her ex-husband attacked her last night. He came here to her home and that's where police arrested him. However, William Freeman was released by a judge within a couple of hours and his ex-wife tells me she's angry and scared over his release.

Mrs. Freeman: Judge Conard saw the physical abuse photographs that were severe on my legs, they were totally black and blue and he still, still released him. I don't understand.

Judge Conard: At the most, this is a third degree assault, at the very most, and it probably won't even be filed, so there was no merit to the claims.

Reporter: St. Charles police didn't want to release the suspect but Judge Frank Conard ordered him at first by phone and then with this written order. Initially police refused because the order was by phone but they finally relented.

Chief King: The provisions of the law allow us, I don't want to discuss the technicalities of the law, but they allow us to hold an individual for this crime for a period of up to twenty hours. And that's what we were doing.

Reporter: But the twenty-hour rule applies to couples who are married or live together and the Freemans are divorced. While it may be very unusual it is perfectly legal for a judge to issue an order by telephone and by not obeying that order, the chief of police has found himself in contempt of court.

Judge Conard: I'm having a pleading prepared at this time to bring the chief in. He will have the right to a hearing. He's going to have to answer why he shouldn't be held in contempt.

Reporter: The judge does know the couple. In August he finalized their very long messy divorce.

Judge Conard: The person that I saw that was battered was the husband. He'd been beaten to a pulp by the boyfriend of the wife.

\* \* \* \* \* \*

Reporter: St. Charles City Police Chief Dave King is being called into court by Family Court Judge Frank Conard. Here's why. Colleen Freeman told police her ex-husband William came to her home and attacked her. Police took Mr. Freeman into custody. Conard who oversaw the divorce proceedings called the department and ordered Freeman freed. But police balked at taking an order over the phone. They wanted it in writing.

Chief King: My understanding, initially he ordered the, my officers to release them. And that is not our policy to do that.

Reporter: But attorneys including Mr. Freeman's lawyer agreed the judge has the power to release Freeman from police custody.

Attorney for Mr. Freeman: The judge can assess the situation and order a bond. Once that he does so, it may be around his neck for the consequences but nevertheless he's entirely in his control.

Reporter: The judge tells us he released Freeman because of his vast knowledge of the couple.

Judge Conard: It was at most he pushed her, she pushed him type of event.

Reporter: Mr. Freeman's attorney gave us these pictures which he claims show his client was a victim of previous abuse, not the wife.

Judge Conard considered the statements made to the press by Chief King to be contemptuous. He believed that the statements implied, "that I had put a wife batterer back out on the street", that I "had no consideration of the law, victim's rights", and questioned "the authority of the court to order somebody to be released." Judge Conard did not pursue a civil contempt charge because he believed it would require another judge. Instead he filed charges against Chief King for criminal contempt for failure to release Mr. Freeman when first ordered the night before. Judge Conard acknowledged that in their last telephone conversation the night before, he had agreed that if King released Freeman, he would consider it immediate. Judge Conard maintained, however, that upon further legal research he determined that criminal contempt could not be purged by subsequent compliance. Judge

Conard stated, "Well, I guess that promise was made based on my ignorance of the law."

Judge Conard filed a show cause order against Chief King on November 30, 1995. Accompanying the order was a notice of contempt affidavit made by Judge Conard. The affidavit included the following statements:

\* \* \* \* \* \*

6. That an [sic] personal recognizance bond was verbally ordered by Judge Conard at 7:00 p.m. on November 29, 1995.
7. That the police officers on duly [sic] at the St. Charles City Police Department informed Judge Conard that they were ordered by Chief King not to release Mr. Freeman.
8. That Judge Conard personally contacted Chief King to inform him of the Constitutional and Statutory authority for such release and Judge Conard was told by Chief King that he would not release Mr. Freeman, whether the order was verbal or written.
9. That a written bond memorandum, Exhibit 1 was prepared and filed with the St. Charles City Police Department ordering an immediate release of Mr. Freeman on his personal recognizance.
10. That the officer on duty, Lt. Amendola, informed Judge Conard that he was under direct orders of Chief King not to follow the order of the Court, and failed to release Mr. Freeman, at that time.
11. Approximately one hour later Chief King called Judge Conard at his home, and indicated that he still had not released Mr. Freeman and that he was not sure if he would follow the order of the Court.
12. That the failure to immediately release Mr. Freeman is a violation of 476.110, RSMo, subparagraph 3, since it was a willful disobedience of a process and order lawfully issued by the Court.
13. That at sometime later Mr. Freeman was finally released from jail.

Chief King filed a written request for the disqualification of Judge Conard. Judge Conard overruled the motion. King applied to the Eastern District of the Court of Appeals for a Writ of Prohibition to prevent Judge Conard from hearing the case. The Court of Appeals denied the writ.

The matter was heard on December 6, 1995. At the hearing, Chief King was found in contempt of court and was given a suspended sentence of fourteen days confinement in the St. Charles County jail conditioned upon the following: that King make no statement showing disrespect for the court or criticizing Judge Conard; that King prepare a written report on the role of the court in releasing a respondent in custody and the duty of a police officer to follow the orders of a court and future procedures to be used in St. Charles City; that Chief King post the report as an order to be followed by the St. Charles police department; and that Chief King make a public apology to the court.

After the hearing, Judge Conard participated in an interview with a television reporter about his reasoning and motivation in finding Chief King guilty of contempt. Portions of the interview are set out below:

Reporter: What was the point of—what were you trying to communicate to the chief yesterday?

Conard: That is a judge issues an order, the only obligation the police have is to follow that order. They don't have a right to question the order to verify that the judge has the legal authority to issue the order. Their only obligation is to follow it. . . .

\* \* \* \* \* \*

Reporter: Okay. He apparently, from the gist of the news conference the day before this all yesterday, he was talking like, as a point of conscience, he felt like this was potentially life or death. And he just, you know, if it comes down to obeying a judge's order for whatever that is worth or, hey, this is potentially a life and death thing, I have to go with protecting this woman. Is that something—is that a thought pattern on his part that you can respect and, for that matter, admire, or is that just flat out of line?

Conard: It's out of line. The judicial system will only function if people follow orders of the Court. Whether or not they agree with them is not the issue....

\* \* \* \* \* \*

Reporter: Okay. This detective here—was the camera brought in the courtroom for, I guess, the first time in history of St. Charles. Is that accurate, St. Charles—
Conard: That's correct. That's correct. And that was done for a very valid reason. When a case is pending, a judge is prohibited by the Ethics Commission from talking to the press about the case. So there were quite a few press conferences held. There were a lot of things that were said during these various press conferences which I was unable to comment upon. And in an effort to try and tell my side of the story on this incident, I was asked if we would bring the camera into the courtroom. And I had no problem with that, and that's why it was allowed in this case.
Reporter: Okay. Did you—did you feel like you had to undo some of the damage that the chief—the damage that you say the chief had caused by making sure your portion was out or did you feel like it had turned personal or—
Conard: I was more concerned with the damage to the court system. If the average person starts to believe that the judges do not have the authority to issue orders that the police must follow, we're in a pretty bad state....

\* \* \* \* \* \*

Reporter: ... They were—this perception that it was an ego thing between the two parties and judge gets his feathers ruffled so he lashes out against the police chief and, you know, this misperception of what you were trying to communicate. What would you tell these people who took that from what happened yesterday?
Conard: I would say it would be terribly unfortunate. That was never the intent. I didn't think of this thing as a personal battle between myself and the chief at all. It escalated in the press because there were a number of false statements that were made. The false statements got

whipped into a frenzy among the public, and it was necessary then to have a hearing over in court to try and straighten out the facts....

\* \* \* \* \* \*

Reporter: Since you can't change what Chief King did, if all the events on his side of this were the same, do you—if you had it to do over—do you think that there was a point at which maybe the two of you—like you could have straightened the chief out over the phone or—I don't know—was there any point in which this escalation of tensions could have been averted and the chief could have been given a chance to realize that he was out of line, either quietly or behind the scenes?
Conard: That was offered. On the night of the event, the last call to my home was about 10:50, and I informed the chief at that time that if he released this man from jail, he could ignore the order that I gave him to appear in court the next day and the matter would be closed. When I went to bed that night, I thought the matter was closed.

Unfortunately, the police chief called a press conference at midnight. He called another press conference at 9:00 in the morning. At both of those press conferences, he attacked the authority of the court to issue the order, and that's why we found ourselves in the middle of this brouhaha. If that had not been done, there would never have been any action brought against the chief.

\* \* \* \* \* \*

In another interview, Judge Conard made the following statements:
Reporter: ... Your Honor, you basically sentenced him to homework. Did you go so easily on him because of considerations of his wife's pregnancy?
Conard: No, I gave him what I consider to be an appropriate sentence. Under the law in criminal contempt, I must either fine him or put him in jail.

\* \* \* \* \* \*

Conard: No, I didn't want to humiliate the chief. I wanted to make it clear that the

Constitution is alive and well in this county. I believe very strongly in that.

The Court of Appeals, Eastern District, entered its order in prohibition on March 26, 1996, holding that Judge Conard's order of contempt against Chief King was invalid and unenforceable because it did not contain a recitation of the essential facts constituting contempt.

## II.

The Commission on Retirement, Removal and Discipline held a two-day hearing on July 8 and 9, 1996, regarding Judge Conard's conduct. The Commission found against Judge Conard on four of the eight counts that were brought against him. On these counts, the Commission stated:

*Count 4.* The Commission concludes that paragraph 11 of Respondent's affidavit [Exhibit 18K] which states:

"Approximately one hour later Chief King called Judge Conard at his home, and indicated that he still had not released Mr. Freeman, and that he was not sure if he would follow the order of the court."

is partially true and partially not true. While the 10:42 p.m. phone call covered the technical shortcomings in Respondent's one line order and the lack of clear statutory authority, the clear conclusion of the conversation was that Mr. Freeman would be released and he was. Respondent's statement "that he (Chief King) was not sure if he would follow the order of the court" is not true to the extent that it is both incomplete and misleading. Such conduct is in violation of Rule 2 Canon 1, 2A, 3A(1) and is misconduct under Article V, section 24 of the Constitution of the State of Missouri.

*Count 5.* The Commission concludes that Respondent breached his agreement with Chief King as set out in Count 5. In addition, the Commission concludes that Respondent's motivation for breaching the agreement was the umbrage he took from press statements made by Chief King and the manner in which Respondent was being portrayed by the press as a result of the incident. It is very doubtful that Chief King's statements to the press warrant a contempt citation. However, Respondent failed to charge Chief King regarding his press statements and instead chose to break his word and proceed on the Chief's failure to immediately follow Respondent's written order to release the prisoner. Such conduct is a breach of the high standard of integrity demanded of our judiciary and is a violation of Canons 1, 2A and 3A (3) and is misconduct under Article V, section 24 of the Constitution of the State of Missouri.

\* \* \* \* \* \*

*Count 7 and 8.* The Commission concludes that the various statements Respondent made to the press as set out in Counts 7 and 8 were made when Respondent knew the cases *State v. King and State v. Freeman* were pending or impending. The Commission further concludes that the statements were not made for the purpose of explaining the procedures of the Court or in the course of official duties. The degree to which the various statements were disseminated to the public by the news reporters exacerbates the misconduct. The Commission concludes that this conduct is in violation of Rule 2, Canons 1, 2A, and 3A (6) and is misconduct under Article V, section 24 of the Constitution.

The Commission recommended that Judge Conard be suspended from office without pay for a period of ninety days.

## III.

 Our responsibilities in disciplinary matters are set out in *In re Baber:*

This Court is not required to adopt the recommendation of the commission in a judicial disciplinary proceeding. The ultimate responsibility to "remove, suspend, discipline or reprimand any judge of any court" is entrusted to this Court. Accordingly, we conduct an independent review of the evidence and the commission's fact findings, and where credibility is at issue, we give substantial consideration and due deference to the commission's ability to judge the credibility of witnesses appear-

ing before it. Because a disciplinary proceeding is civil rather than criminal in nature, the charges must be proven by a preponderance of the evidence.

847 S.W.2d 800, 802 (Mo. banc 1993) (citations omitted).

■■■ The Missouri Constitution authorizes discipline to be imposed upon a judge for misconduct. *Mo. Const., art. V, section 24.3.*[2] Judicial error or the exercise of poor judgment does not warrant discipline. *In re Elliston,* 789 S.W.2d 469, 475 (Mo. banc 1990). Misconduct means transgression, dereliction, unlawful, or wrongful behavior, or impropriety that is willful in nature. *In re Baber,* 847 S.W.2d 800, 806 (Mo. banc 1993).

### IV.

■■■ As a preliminary matter, it is necessary to address one issue of substantive law. Judge Conard had jurisdiction to order Mr. Freeman's release. The Missouri Constitution guarantees to all persons the right to bail except for capital offenses. Article I, section 20 provides:

> Bail guaranteed—exceptions.—That all persons shall be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great.

Because this is a constitutional right, it is neither dependent upon, nor may it be limited by, state statute or court rule. *Kinder v. Richeson,* 264 S.W. 982, 984 (Mo. banc 1924). There is no requirement that an individual be charged with a crime to be entitled to bail. Indeed, it is antithetical to suggest that an individual against whom sufficient evidence exists to support a criminal charge should enjoy greater rights than an individual who may never be charged at all. *See generally, State v. Allen,* 275 Mo. 391, 204 S.W. 721 (1918); *State ex rel. Corella v. Miles,* 303 Mo. 648, 262 S.W. 364 (banc 1924); *Kinder v. Richeson,* 264 S.W. 982 (Mo. banc 1924).

The Missouri Constitution also protects crime victims and the community. Article I, section 32.2 provides:

Rights for victims of crimes.—

\* \* \* \* \* \*

2. Notwithstanding section 20 of article I of this Constitution, upon a showing that the defendant poses a danger to a crime victim, the community, or any other person, the court may deny bail or may impose special conditions which the defendant and surety must guarantee.

Article I, section 32.1(2) further provides that the victim of a crime has the right to be informed of and heard at bail proceedings "unless in the determination of the court the interests of justice require otherwise."

The telephone call from Mr. Freeman's attorney to Judge Conard initiated a proceeding for his release on bail. Because Mr. Freeman was being held by the St. Charles police department, Chief King was the proper adverse party. Mrs. Freeman also should have been notified absent a determination that the interests of justice required otherwise.

While proceedings requiring immediate relief often must be conducted without the formalities normally associated with court process, we cannot condone Judge Conard's willingness to order Mr. Freeman's release prior to speaking to a representative of the police department. In many instances there are valid reasons for keeping an individual in jail for the twenty hours allowed by section 544.170. This is so especially in instances of domestic abuse when continued violence is a threat. An order of this type should be made only with the greatest care and after evaluation of all the evidence pro and con. It is pointless now to guess whether Judge Conard's decision to release Mr. Freeman displayed good or bad judgment. Regardless, Judge Conard had the constitutional authority to order Mr. Freeman released.

■■■ It is clear that Chief King understood the importance of his role to advocate the continued incarceration of Mr. Freeman. However, despite his disagreement with the decision made by Judge Conard and despite

---

**2.** The text of Mo. Const., art. V, Section 24.3, reads:

> Upon recommendation by an affirmative vote of at least four members of the commis-

sion, the supreme court en banc, upon concurring with such recommendation, shall remove, suspend, discipline or reprimand any judge of any court ... for misconduct. ...

the technical deficiencies of Judge Conard's order, Chief King was wrong in his temporary refusal to comply with the oral and written orders of the court. Having failed in his efforts to convince the judge not to order Mr. Freeman's release, Chief King was obligated to comply. Judge Conard properly viewed Chief King's initial attempts to resist complying with his order as contemptuous of the power of the court. *State ex rel. Picerno v. Mauer* properly sets out the law of Missouri in this respect:

> ... the direct order of the trial judge fixes the limits of proper advocacy. If the ruling is adverse, there is no right of counsel to resist or insult the judge. Any attack on the propriety of the order must be by the judicial process and not willful disobedience. Until the judgment of a court is set aside by such court upon reconsideration, or is reversed for error upon orderly procedure, its orders must be respected by full obedience. The prime purpose of the writ of prohibition is to prevent a usurpation of judicial power and not to provide a remedy for all legal difficulties or to serve as a substitute for appeal.

920 S.W.2d 904, 911–12 (Mo.App. W.D.1996) (citations omitted).

We commend Judge Conard's initial willingness to forgive Chief King's contempt if King would promise to release Mr. Freeman that evening. Chief King accepted Judge Conard's offer and the matter should have ended there. Unfortunately, it did not. Chief King continued the dispute with his comments to the press and Judge Conard retaliated with a charge of criminal contempt.

## V.

Counts 4 and 5 relate to Judge Conard's promise to drop the contempt charges if Chief King abided by his order to release Mr. Freeman. Count 4 charges Judge Conard with filing an affidavit in the contempt proceeding that was incomplete and misleading. Although nothing affirmatively stated in the affidavit was false, the affidavit failed to mention the agreement reached between Judge Conard and Chief King. Count 5 directly addresses Judge Conard's failure to comply with the agreement to drop the contempt charges after Chief King complied with the order to release Mr. Freeman. Because the validity of Count 4 depends on whether an agreement actually existed between Judge Conard and Chief King, we address Count 5 first, which deals directly with that issue.

■■■ Judge Conard challenges the Commission's finding of misconduct under Count 5 in a number of ways. First, he contends that there was no agreement. Because Chief King appeared at Court the next morning and because Chief King made statements to others that he did not know if Judge Conard was going to send him to jail or not, Conard argues that King must not have believed there was an agreement and there was not the meeting of the minds necessary for a valid agreement.

We are not persuaded. The recorded conversation between Judge Conard and Chief King clearly shows the agreement reached by the parties. King's various statements to others and his appearance at court the next morning show only his desire to protect himself, his refusal to let the matter die, and his attempts to build a base among law enforcement officers and the public.

■■■ Judge Conard next contends that he did not breach the agreement because it extended only to the contempt hearing scheduled for the next morning and did not purge the Chief of his criminal contempt. Again, we are not persuaded. A plain reading of the telephone transcript could only be interpreted as ending the matter:

> King: Well, you said you wanted me to release him. I'll release him, Frank. And I've got a sick wife, and I hope you can understand that. And we've got a baby on the way that is a very high risk baby and she needs me and she. doesn't need me screwing around standing in front of you getting whatever I am going to get out of you. That's my personal choice. You told me to release him, I'll release him, Frank, okay?
>
> Conard: That's fine. Then we have no problem.

Finally, Conard contends that his actions were justified because subsequent conduct cannot purge criminal contempt. In his testimony before the commission, Judge Conard responded to questioning as follows:

> Comm. McQuie: But you have a promise, you promise this man do this and I won't find you in contempt. What happens to that promise?
>
> Comm. Smith: That's my question.
>
> Conard: Well, I guess that promise was made based on my ignorance of the law.

Certainly, the law of contempt has many intricacies, whether direct or indirect, criminal or civil. However, Judge Conard has not cited any law that would preclude a judge from dismissing a charge of criminal contempt prior to its adjudication, nor have we been able to find any law supporting that contention. In contrast, at least one legal authority provides that:

> [A] criminal contempt may be purged, before adjudication, by a complete disclaimer of all contumacious intent, where the court believes no useful purpose would be subserved by further proceedings.

17 C.J.S. *Contempt* section 105.

■ In fact, the record is relatively clear about the reason Judge Conard broke his promise to Chief King. During questioning by Commissioner McQuie, Judge Conard stated:

> Comm. McQuie: What did you mean by your last comment to the chief of police in that telephone conversation, that's fine, then we have no problem.?
>
> Conard: Because at that point, I was hoping the whole matter was closed.
>
> Comm. McQuie: And it wasn't closed?
>
> Conard: Not when he made further statements that attacked the integrity of the court.

3. Canon 1 reads:

**A Judge Should Uphold the Integrity and Independence of the Judiciary**
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should observe, high standards of conduct so that the integrity and

> Comm. McQuie: And those were made in television broadcasts that you heard as you arose the next day?
>
> Conard: Yes, sir.

The record also contains an interview in which Judge Conard stated:

> On the night of the event, the last call to my house was about 10:50, and I informed the chief at that time that if he released this man from jail, he could ignore the order that I gave him to appear in court the next day and that the matter would be closed. When I went to bed that night, I thought the matter was closed.
>
> Unfortunately, the police chief called a press conference at midnight. He called another press conference at 9:00 in the morning. At both of those press conferences, he attacked the authority of the court to issue the order, and that's why we found ourself [sic] in the middle of this brouhaha. If that had not been done, there never would have been any action brought against the chief.

Under the circumstances, it is certainly understandable that Judge Conard believed that he had been betrayed by Chief King's actions. Whether Chief King's statements to the press would have supported new contempt charges is a question not before us. Judge Conard did not charge Chief King with contempt concerning these statements. Instead, he reneged on his agreement with Chief King and resurrected the old contempt charge. He broke his word given to Chief King that he would consider the release to be "immediate" and that the two men would "have no problem". As such, Judge Conard failed to "observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved" in violation of *Canon 1;*[3] to conduct himself at all times to "promote public confidence in the integrity and impartiality of the judiciary" in violation of *Canon 2;*[4] and to be "dignified...to liti-

independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

4. Canon 2 reads:

**A Judge Should Avoid Impropriety and the Appearance of Impropriety in the Judge's Official Activities**

gants" in violation of *Canon 3A(3)*;[5] all constituting misconduct under *Mo. Const. Art. V, section 24.*

The foregoing also makes clear that Judge Conard's failure to include any reference to his agreement with Chief King in the contempt affidavit was material and rendered the affidavit not true to the extent that it was both incomplete and misleading. As such, Judge Conard failed to "observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved" in violation of *Canon I;* to conduct himself at all times to "promote public confidence in the integrity and impartiality of the judiciary" in violation of *Canon 2;* and to be faithful to the law in violation of *Canon 3A.(1)*[6] all constituting misconduct under *Mo. Const. Art. V, section 24.*

## VI.

Counts 7 and 8 charged Judge Conard with making statements to reporters regarding the cases of *State of Missouri v. David A. King,* CV195–7358CC and *State of Missouri v. William Freeman* while the cases were pending or impending. *Canon 3A.(6)* provides:

> A judge should abstain from public comment about a pending or impending proceeding in any court and should require similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the Court.

This canon does not preclude all statements by judges about pending cases. As the second sentence of the canon points out, judges may explain procedural matters regarding pending and impending cases.

▮▮▮▮ Another exception also has been recognized. If publicly attacked, judges may explain their position. *In re Miera,* 426 N.W.2d 850, 857 (Minn.1988). This exception is described as a qualified privilege. *Id.* The present case presents a clear example of why such a privilege is necessary. The privilege, however, must be limited to a moderate and dignified response to the attack made upon the judge and may not be of a nature in quantity or substance that creates more harm than benefit to the judicial system.

In this case, Judge Conard was directly attacked in the press both by Chief King and Mrs. Freeman regarding his decision to allow Mr. Freeman an appearance bond. He also was attacked regarding his decision to file a contempt charge against Chief King. Judge Conard could properly respond to these charges.

It is not necessary for us to review each of Judge Conard's statements to determine which might have been procedural in nature and which might have been justified as a privileged response. Unfortunately, one of Judge Conard's statements did not relate to court procedures and exceeded his privilege to respond. Referring to the possible charges that might have been filed against Mr. Freeman, Judge Conard stated:

> At the most, this is a third degree assault, at the very most, and it probably won't even be filed, so there was no merit to the claims.

This statement reflected a pre-judging of the merits of criminal charges that might have

---

A. A Judge should respect and comply with the law, and the judge's conduct at all times should promote public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow family, social, or other relationships to influence the judge's judicial conduct or judgment. The prestige of the judge's office should not be lent to advance the private interests of others; nor should the judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness.

**5.** Canon 3A.(3) reads:

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity and should require similar conduct of lawyers and of staff, court officials, and others subject to the judge's direction and control.

**6.** The text of Canon 3A.(1) reads:

A judge should be faithful to the law and maintain professional competence in it. The judge should be unswayed by partisan interests, public clamor, or fear of criticism.

been filed against Mr. Freeman without the benefit of investigation, evidence, or argument. It was not justified by any of the attacks made upon Judge Conard and the attitude it revealed was a discredit to the judiciary. Moreover, the statement could be interpreted as an attempt by Judge Conard to influence the determination of whether charges would ultimately be brought against Mr. Freeman. As such, Judge Conard failed to "observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved" in violation of *Canon I;* to conduct himself at all times to "promote public confidence in the integrity and impartiality of the judiciary" in violation of *Canon 2;* and to "abstain from public comment about a pending or impending proceeding in any court" in violation of *Canon 3A.(6);* all constituting misconduct under *Mo. Const. Art. V, section 24.*

## VII.

While we concur with the recommendation of the Commission that Judge Conard is guilty of misconduct as charged in Counts 4, 5, and 8, we believe the punishment assessed by the Commission was too harsh. A number of mitigating factors exist. First, Judge Conard was only in his first year on the bench when this incident took place. *See, In Re Turner,* 421 So.2d 1077, 1081 (Fla.1982); *McCartney v. Commission on Judicial Qualifications,* 12 Cal.3d 512, 116 Cal.Rptr. 260, 279, 526 P.2d 268, 287 (1974). Second, we are not aware of any other complaints concerning Judge Conard's conduct. Third, Judge Conard was involved in a complex area of the law. And finally, Judge Conard was provoked by an attack in the media by another public official who was not blameless. Although none of these factors excuse Judge Conard's misconduct, they can be considered in determining the appropriate discipline that is needed to make certain that this type of behavior will not reoccur. The considerable sting of a public reprimand also may be taken into account. Notwithstanding the above, however, Judge Conard has not yet appeared to accept and acknowledge that his behavior in this matter was wrongful. For

these reasons, we believe that a suspension of thirty days without pay is appropriate.

## VIII.

It is ordered that Judge Frank A. Conard be suspended from judicial office for a period of thirty calendar days without pay. The period of suspension will commence on the first day of the month following the issuance of the mandate in this case.

BENTON, ROBERTSON and COVINGTON, JJ., concur.

WHITE, J., concurs in part and dissents in part in separate opinion filed.

HOLSTEIN, C.J., and LIMBAUGH, J., concur in opinion of WHITE, J.

WHITE, Judge, concurring in part and dissenting in part.

This is a case about contempt. About the contempt shown for the lawful, judicial authority of this State by one who swore an oath to uphold that authority. Although the principal opinion fails to see it, it is also a case about the law of contempt.

Contempt can be—as the majority suggests—"a complex area of the law." But the contempt issues in this case involve the most basic concept in that body of law, the distinction between civil and criminal contempt:

> Civil contempt is intended to benefit a party for whom an order, judgment, or decree was entered. Its purpose is to coerce compliance with the relief granted. A civil contemnor has at all times the power to terminate punishment by complying with the order of the court. Criminal contempt is punitive in nature and acts to protect, preserve, and vindicate the authority and dignity of the judicial system and to deter future defiance.[1]

The salient facts on this issue are not in dispute. Judge Conard issued a lawful order compelling the release of a prisoner, and Chief King chose to defy that order. In trying to enforce his order, Judge Conard told Chief King that he would either have to obey his order or face a contempt charge.

1. *State ex rel. Chassaing v. Mummert,* 887 S.W.2d 573, 578 (Mo. banc 1994).

Although Chief King complied with the order, he then publicly and repeatedly attacked the court, leading Judge Conard to file a charge of criminal contempt against him. It is clear that the proceeding initially contemplated by Judge Conard was a civil contempt hearing. Its purpose was to enforce compliance with his order compelling the release of Mr. Freeman.[2] As such, his representation to Chief King—that all he had to do to avoid an appearance on that charge was to comply with the order—was not an attempt to make a deal; it was simply an accurate statement of the law of civil contempt. Chief King purged himself of the civil contempt when he released Mr. Freeman, and no proceeding on the matter was held. But Chief King did nothing to assuage the injury to the dignity of the court. Rather, he added insult by publicly and repeatedly defying its authority, proclaiming that he did not regret his actions and that he would do the same thing again. It was this outrageous conduct and, apparently, some research into the law of criminal contempt that led Judge Conard to charge Chief King with criminal contempt.[3] Such a punitive sanction was appropriate. Chief King's refusal to obey a lawful order was a direct, blatant challenge to the authority and dignity of the court. His subsequent defiance only compounded that wrong. Criminal contempt was a proper response.

Judge Conard tried repeatedly to explain this distinction to the Commission. It was not receptive to such a technical argument. The mode of analysis adopted by that body was straightforward. It saw this as simply a question of whether Judge Conard said that Chief King could purge himself of contempt by freeing Mr. Freeman and then, nevertheless, charged him with contempt. This is best exemplified by Commissioner Smith's cross-examination, which led up to Judge Conard's "promise was made in the ignorance of the law" statement.[4] Viewed in

2. Judge Conard ordered Chief King to appear "to show just cause for [his] refusal to follow the valid order of a Circuit Judge" or face arrest.

3. On December 1, two days after he issued the first show cause order, Judge Conard issued an entirely new order, requiring Chief King to appear and "show cause why he ... should not be adjudged guilty of, and punished for, Contempt of Court...."

4. [Commissioner Smith]: I guess I'm a little confused. I think I'm supposed to be. I'm a layman here. And I think maybe when this Commission was established they expected a couple people here not to be familiar with the legal jargon and technicalities to exist as to interpret them that way and maybe a little different way. So I got to cut through all this. Maybe I can ask a question or make an observation and you can answer it. You won't have to go through too many questions. Seems to me like you told the police chief if he obeyed your order, he would not be held in contempt?

[Judge Conard]: Yes, sir.

Q: All right. Then you were going to withdraw the show cause?
A: Yes, sir.
Q: That's semantics that I have problems with here. This is the layman. You had an agreement. He said okay. If you do this, I'm going to, and you are going to withdraw the show cause?
A: That's right.
Q: So then the police chief did what you wanted him to, the show cause was withdrawn?

A: And it was.
Q: But then it was reinstated?
A: That's correct.
Q: And was reinstated then apparently because he criticized the court?
A: Well, after he criticized the court, then I did the legal research and determined that the subsequent following of the act—
Q: What do you mean subsequent following of the act? I want this down in layman's words. What did he do then that would cause you again to issue that order?
A: The fact that he decided to follow the order at 11:00 doesn't violate the contempt, the criminal contempt that occurred at 10:00 when you refused to follow it or earlier on the oral order.
Q: But you said there would be no such order and he did, regardless of his motives, he did what you wanted him to do. He released the prisoner. That's what you wanted him to do?
A: Yes, sir.
Q: Prisoner's gone, fire is out?
A: Yes, sir.

[Judge Conard's counsel]: This is a follow-up to Mr. Smith's questions. I think the question that Mr. Smith is looking at, Judge Conard, is this, is that if the chief says okay, I'm going to release the prisoner and you say okay, that cancels the contempt, cancels an order to show cause, that in criminal contempt you cannot by later obedience eliminate the criminal contempt, am I right about that?
A: That's my understanding of the law.
Commissioner McQuie: But you have a promise, you promise this man do this and I won't find

context, this statement is not an admission that any agreement was made. It is a response to a question assuming that a promise had been made. While it is perhaps understandable that Commissioners were uninterested in the intricacies of contempt law, this Court can not be so cavalier.[5] The principal opinion adopts the Commission's paradigm without even pausing to consider whether it is appropriate. The majority treats this conversation as a negotiation, as if judges are required or encouraged to make deals to get their orders enforced. I do not see Judge Conard making an offer to Chief King in this conversation. He is, quite correctly, telling him what the consequences of his failure to obey will be. Nothing in that conversation suggests that Chief King will not face criminal contempt charges for his willful defiance of a lawful court order.

As the majority notes, misconduct requires more than an error of law or judgment, it requires a "transgression, dereliction, unlawful, or wrongful behavior, or impropriety that is willful in nature." Both the Commission and the principal opinion seek to supply Judge Conard with an improper motive by noting that he only filed the contempt charges in response to attacks by Chief King.

This is not an improper motive. Chief King's announcement that he did not regret his defiance of the court's order and that he would do it again greatly magnified the original injury to the dignity and authority of the court by making the challenge public and highlighting his continued disrespect for lawful authority. The fact that Judge Conard did not include the press statements as grounds for contempt is irrelevant. The initial act of defiance was the fundamental problem, and criminal contempt was appropriate to punish it.

Since I believe that Judge Conard had no wrongful motive in charging Chief King with contempt, I do not find that any of the Canons of Judicial Conduct were violated by the conduct alleged in Count 5. But one charge is particularly absurd. The principal opinion convicts Judge Conard of violating Canon 3A(3), which advises a judge to be "patient, dignified, and courteous to litigants...." Even a cursory review of the record shows the great lengths to which Judge Conard went to be reasonable. The patience he displayed—at eleven o'clock—after hours of open defiance by Chief King, in attempting to walk him through the legal basis for the release order is remarkable.[6]

you in contempt. What happens to that promise?
Commissioner Smith: That's my question.
A: Well, I guess that promise was made based on my ignorance of the law.

5. While the authority cited in the principal opinion indicates that criminal contempt can be purged, its only authority on the topic is a 1920 California Court of Appeals case. *Ryan v. Superior Court*, 49 Cal.App. 71, 192 P. 1036, 1040 (1920). The principal opinion does not suggest what Chief King did that amounted to "a complete disclaimer of all contumacious intent." Perhaps had he sent a letter to Judge Conard renouncing any desire to treat him disrespectfully—as the alleged contemnors in *Ryan* did—instead of going to television and attacking him, I would be more inclined to see that case as a relevant precedent. The majority cites no precedent for the proposition that a judge must excuse contemptuous behavior merely because the contemnor eventually conforms his conduct to the requirements of the law.

6. [Judge Conard]: Hey Dave, all I want you to do is follow that order. If you tell me you are not going to do it, that's what you have told me, then I want you to come before the court and tell the

court why you believe you don't have to follow the order of the court. It's just that simple.
Chief [King]: I will tell you one thing, one of the things you have cited here is RSMo 544.170. I've got the provision here in front of me Frank. It deals with the 20 hour hold provision.
[Judge Conard]: Absolutely.
Chief [King]: What do you mean absolutely? It gives the police, as I read this, the right to hold somebody for 20 hours and if we hold them for longer than that, then we are in trouble.
[Judge Conard]: We get tired of pushing it; don't stop halfway.
Chief [King]: What part am I missing?
[Judge Conard]: The last two sentences when it talks about release. I can order him to be released.
Chief [King]: Now wait a minute, hold on, these are long sentences you know.
[Judge Conard]: That's the attorney general's opinion. I can cite you the attorney general's opinion, is that the annotated statutes or just the regular statutes?
Chief [King]: I have the Missouri Revised Statutes 1994.
[Judge Conard]: Get the red book.
Chief [King]: Yep.
[Judge Conard]: Okay, if you have the annotated statutes, it would contain a Missouri Attorney

Count 4 deals with the question of whether Judge Conard lied in his contempt affidavit when he said that, during the final call of the evening, Chief King "indicated that ... he was not sure if would follow the order of the court." Contrary to what the principal opinion holds, the question of whether this statement is true does not depend upon whether an agreement existed between Judge Conard and Chief King. It depends upon whether the statement is true. Despite Chief King's eventual acquiescence to Judge Conard's order, he repeatedly equivocates about whether he will follow it:

> Frank: Well anyway, that's all there is to it you know. You can either do one of two things; you can inform me right now; that he is going to be released now and I will say that is still immediate even though it's an hour late, or you can tell me you are not going to release him in which case you've got an order and I will see you in the morning.
>
> Chief: Well the City Attorney just walked in, what are my options in discussing our conversation with him and calling you back?

The repeated questioning of the judge's authority in the face of a lawful order was sufficient to support a criminal contempt charge. The fact that, after prolonged cajoling, Chief King eventually agreed to comply does not change the fact that he did express doubts as to whether he would enforce the Judge's order. The affidavit's allegation is literally true. It is not misleading since, for the purposes of criminal contempt, subsequent compliance with the order does not purge the contempt. Additionally, the evidence does not support the finding that this supposed untruth was willful. I would not find misconduct on Count 4.

I agree with the principal opinion that Judge Conard overstepped the bounds of his privileged right to reply to his attackers when he commented on the impending prosecution of Mr. Freeman. Accordingly, I concur in the finding of misconduct on count 8. In addition to the mitigating factors cited by the principal opinion, I would also include the extreme provocation directed at Judge Conard by Chief King—who was more than merely "not blameless."

I would reprimand Judge Conard for his misconduct on count 8.

General's opinion in there. The Attorney General's opinion is absolutely clear. The Circuit Judge has the authority to ...

Chief [King]: Wait a minute. Is this in fine print someplace at the end of this thing? It says cross references ...

[Judge Conard]: Oh yeah, if you've got that, then look at the bottom at Section 8 under the annotations.

Chief [King]: Well, no I don't think I've got the right book, I don't think I have the book you're talking about. There isn't a section 8 in here.